WILLIAM H. TUCK *vs.* EDWARD H. CALVERT, THE
NATIONAL BANK OF BALTIMORE and WASHING-
TON J. BEALL, Executor.

THE NATIONAL FARMERS' BANK OF ANNAPOLIS *vs.*
THE SAME.

*Right of the Executor of a Surety for the payment of
the Purchase money of Real estate, which he had paid,
to be Indemnified out of the proceeds of the Property
when Sold under a Decree in Equity— Vendor's Lien
—Taxes as a Preferred claim.*

A purchased certain real estate and gave his two single bills, with B and
C as securities for the purchase money, the vendor retaining his legal
title to the land. Judgments were recovered on these single bills against
A and B, the survivors of C, who had died, and also against D, his exe-
cutor; executions were issued on the judgments and levied on the prop-
erty. On a bill filed by some of the judgment creditors of A, alleging
that this property with other property belonging to A, was about to be
sold under execution, and that a sale by the sheriff would be disastrous
to the interests of the creditors, and especially of the junior judgment
creditors, and that it would be better for all parties interested therein,
that the property should be sold under a decree of a Court of Equity,
and suggesting that it would be proper for the Court to interpose to pre-
vent a sale by the sheriff, an injunction was issued restraining the sheriff
from proceeding to sell any part of the estate of A; and a decree was
subsequently passed by consent, and the property sold by trustees, and
the proceeds brought into Court for distribution, all questions as to pri-
orities or preferences of any of the creditors of A, whether of judgment,
mortgage, specialty, or other debt or claim, or by way of vendor's lien,
being reserved for the further order or decree of the Court. Pending
the proceedings under the creditors' bill, D filed a petition alleging that
executions had been issued under the judgments recovered against him
as executor, and levied on his property, and that as executor he had paid
the amount due on said judgments; he therefore claimed to be entitled
to be substituted to all the rights and interests of the original vendor.
HELD:

14 v. 33

Tuck *vs.* Calvert, *et al.*

That upon proof that D had paid these judgments as alleged, he was entitled to be indemnified out of the proceeds of the land, for the payment of the purchase money of which his testator was security.

C sold a tract of land to B, took his single bills for the purchase money, and retained the legal title until the purchase money should be paid. C recovered judgment on these single bills, and sometime afterward assigned them as security for a debt which he owed—this debt he discharged, the judgments remaining unsatisfied. The land sold by C was subsequently sold under a decree passed on a bill filed by creditors of B, all liens for unpaid purchase money being reserved. HELD:

That C in virtue of his lien as vendor, was entitled to have his judgment paid out of the proceeds of the property, in preference to other creditors.

Where property is sold under a decree in equity, the taxes due by the person whose property is sold must be first satisfied out of the proceeds.

APPEALS from the Circuit Court for Prince George's County, in Equity.

The bill of complaint in this case was filed on the 7th of November, 1865, by some of the judgment creditors of Thomas F. Bowie, against him and his other judgment creditors, for the sale of his real and personal estate for the payment of debts. The bill charged that the debtor's property was about to be sold under executions which had been levied thereon, and that a sale by the sheriff would be disastrous to the interests of the creditors, and especially of the junior judgment creditors, and that it would be better for all parties in interest, that the property should be sold under a decree of a Court of Equity; it suggested that it would be proper for the Court to interpose to prevent a sale by the sheriff. An injunction was issued as prayed. The prior judgment creditors answered the bill and consented to a sale; before a decree was obtained, the debtor applied for the benefit of the bankrupt law, and was discharged under it, and his assignees in bankruptcy also agreed to the sale. A decree was passed, all questions as to priorities or preferences of any of the creditors whether of judgment, mortgage, specialty or other debt or claim, or by way of vendor's lien, being reserved for the future order or

decree of the Court. The real estate of the debtor, consisting of a house and lot in Upper Marlborough, and three farms called Kinsale, Cheltenham and Brookefield, were sold, and the proceeds arising therefrom brought into Court for distribution. This property, exclusive of Brookefield, sold for $22,153, and Brookfield sold for $11,223. Mr. Bowie had purchased Brookefield from J. A. Osbourn, and had given him his two single bills for the purchase money, with William Z. Beall and Fielder Bowie as his sureties. Judgments were recovered on these single bills against Thos. F. Bowie and Fielder Bowie, survivors of William Z. Beall, who had deceased, and also against Washington J. Beall, his executor. They were finally assigned to the National Bank of Baltimore; Washington J. Beall claimed to have paid them as executor, and to be entitled to be substituted to all the rights and interests of the original vendor and his lien on the lands. Mr. Bowie had also purchased from Edward H. Calvert, a parcel of the Cheltenham property, and for the purchase money had given his single bills; on these a judgment was obtained, which together with the vendor's lien, were assigned to Henry Boyle, as security for a debt; the debt was subsequently discharged. The auditor stated accounts A, B, C, D, E and F. Accounts D and E were stated under instructions from Wm. H. Tuck. The other accounts represented the views of the auditor.

Account "A" ascertained the costs, expenses, commissions and taxes on all the property except Brookefield, amounting to $2,731.99, and after deducting this sum from $22,153.00, the proceeds of the Marlborough property, Kinsale and Cheltenham, the balance, $19,421.01, was carried to account "B." This account allowed Calvert's vendor's lien and a judgment of Amelia H. Chew and R. B. B. Chew, administrators of L. H. Chew, making $1,137.85, leaving a balance of $18,283.16, to be carried to account "C," by which that sum was distributed to the judgments of James C. McGuire, administrator of John D. Brown, Edward G. W. Hall and W. F. Green-

well, use of Duvall, Keighler & Co., and Saml. B. Anderson. These judgments were recovered at November Term, 1857, and signed the 6th of that month, and were allowed preference over the judgment of W. H. Tuck, obtained at the same term, but signed on the 11th of the month.

Account "F," after deducting a proportion of the costs, commissions, taxes, &c., as ascertained by account "A," assigned all the proceeds of Brookefield to the National Bank of Baltimore, as assignee of the two judgments recovered by Osbourn, including costs and poundage fees, and leaving a balance due on these claims.

Account "D" differed from account "A" in that the State and county taxes allowed in the latter were excluded from the former, and after allowing the costs therein mentioned, and the claim of Edward H. Calvert, under his lien as vendor, and the judgment of Amelia H. Chew and Richard B. B. Chew, administrators, *c. t. a.*, of Leonard H. Chew, the balance was carried to account "E" and there distributed *pro rata* among the judgments allowed in account "C," and the judgment of Wm. H. Tuck, as of November Term, 1857, without regard to the day of signing.

The National Farmers' Bank of Annapolis, which held a judgment against Bowie, rendered at November Term, 1858, filed exceptions to all the accounts. The exceptions of the Bank related to some of the allowances for expenses, fees and taxes, and to the allowance of the claim of Calvert, use of Boyle, and of the judgments recovered in the name of Osbourn, use of Eversfield and others, and claimed by the National Bank of Baltimore, as vendor's lien. Exceptions were taken by William H. Tuck to accounts A, B, C and F, and embraced the objections taken to the same accounts by the Bank.

The Court passed an order assigning a day for the hearing of the exceptions, and allowing the claimants to take testimony.

After hearing, the Court passed an order, dated the 9th of July, 1869, by which account "A" was ratified, except as to

the allowance therein of the personal expenses of one of the trustees, and a solicitor's fee for conducting the proceedings and obtaining a decree — the allowance to the trustee was rejected, and the solicitor's fee was directed to be allowed proportionately out of the claims of all the creditors participating in the fund. Account "B" was ratified as to the allowance of the claims of Calvert and Chew's administrators. Accounts "C" and "D" were rejected. Account "E," in so far as it allowed the judgment of Tuck, ratably with the other judgments rendered at the same term, was confirmed. Account "F" was ratified, except as to the claim of Osbourn, upon a judgment rendered at April Term, 1860, and assigned to the National Bank of Baltimore; this claim was suspended for insufficiency of proof of the assignment of the vendor's lien, and leave was given to the parties interested, to take testimony in reference thereto. The claims of Osbourn, use of the National Bank of Baltimore, were allowed to Washington J. Beall, executor of William Z. Beall. The cause was referred to the auditor for further proof in regard to the suspended claim of Osbourn, and with directions to state other accounts as specified in the order. From this order, William H. Tuck and the National Farmers' Bank of Annapolis appealed.

The cause was argued before STEWART, BRENT, MAULSBY, ALVEY and ROBINSON, J.

*William H. Tuck,* in his own behalf.

The exception to the allowance of the taxes, due by the debtor, should have been sustained, except as to those due to the State, as there was personal property on the land sufficient to pay the same, and the Court ought to have directed an account to ascertain how much was chargeable against the realty. *Code of Pub. Gen. Laws, Art.* 81, *secs.* 47, 51.

When executions on some of the judgments against Bowie went into the hands of the sheriff, they were levied on crops

of corn and tobacco on three farms, comprising nearly fifteen hundred acres of land. If the property had been sold by the sheriff, he should have retained for the taxes and paid the collectors. Code, Art. 81, sec. 71. The property was released from the levy by the issuing of the injunction, and it was then liable to be levied on for taxes, and unless the collector can show there was no personalty, he cannot look to the land. Personal chattels must be first taken for payment of taxes. Code, Art. 81, secs. 49, 50, 53, 54.

The Court erred in allowing the claim of Calvert, use of Boyle, in preference to prior judgments. There was no sufficient evidence of the assignment. It should make no difference that Calvert has since paid Boyle, for if Boyle ever held the lien, he has not re-transferred it to Calvert.

The contract for the purchase between Bowie and Calvert was not in writing. Bowie gave his single bills for $600, not expressing on their face the consideration. The notes were never transferred to Boyle, but Calvert obtained a judgment, which was afterwards entered to the use of Boyle. Can the entry of that use give Boyle the benefit of the vendor's lien? Surely not.

The Court erred in allowing one of the judgments of Osbourn, as claimed by the Bank of Baltimore, in account F, because the assignment of the lien was not sufficiently proved.

While it is true that a vendor's lien exists independent of special agreement, and as an incident to the contract of sale, and that he who relies on a waiver of the lien, must show the facts which repel its existence, it is equally true that it cannot pass by implication, but only by express agreement, and that the party claiming as assignee of the lien, must establish his claim by the clearest proof.

It exists for the benefit of the vendor, and all claiming its benefit must claim through him, as having an interest in maintaining it. If he waives it, or so deals with the transaction as to cease to have any interest in its longer existence,

it is gone as to everybody, as when he assigns a note for the purchase money *without recourse*, or the note being negotiable, is not protested when due, by which he, as endorser, would be discharged, the lien is gone, and the indorsee or assignee cannot look to the land.

In this case Bowie gave his single bills with sureties, not specifying that they were for the land, the vendor retaining the title. They were indorsed by the vendor to Eversfield, and by him indorsed to Neale, Harris & Co.

This is not the case of a written contract or note specifying land as the consideration, as in *Willis vs. Bryant*, 22 *Md.*, 373, where the note shewed the consideration to be unpaid purchase money, and the assignor took the risk of collection; nor like *Hooper vs. Logan*, 23 *Md.*, 201, where the agreement of purchase was in writing, and the assignment in writing carried the lien as part of the agreement, but this is a transaction resting altogether in parol, except as to the indorsement of the single bills; and the question is presented, whether, conceding the evidence to be free from all difficulty, such a security as a vendor's lien can be transferred by parol?

No case has been produced in which such a transfer has been sustained. If the position of the appellees be correct, that where the note is indorsed, it may be shewn by evidence that the indorsement was intended by collateral agreement to carry also the vendor's lien, then you add to and vary the import of the transaction as shewn by the indorsement, to the prejudice of persons dealing with the vendee in ignorance of such latent equity.

Judge STORY considers this kind of lien as a trust. If this be correct, it cannot be the subject of parol agreement or assignment. 2 *Story's Eq.*, 1218.

If the vendor's lien were assigned to Eversfield, and by him to Neale, Harris & Co., did it pass to the Bank of Baltimore?

The bank claims as assignee of the judgments, for the single bills were never transferred to it.

The judgments did not represent the vendor's lien—they were merely liens at law. The notes were merged, and no longer the subject of transfer. How could the lien pass as an incident of the contract of sale when the contract—the notes —was not assigned?

These parties dealt with the judgments as liens at law, and cannot, through their efficacy, enforce the vendor's lien. The bank took the judgments subject to all other judgments. *Richardson vs. Stillinger,* 12 *G. & J.,* 478; *Hall vs. Jones,* 21 *Md.*

But the lien did not pass, because, by the legal effect of the mode of transfer adopted, Osbourn was discharged from liability on his indorsement, and no equity remained in him through which the lien could be enforced for the benefit of those claiming as assignees.

These were sealed bills, and the law provides how the assignor is to become responsible. *Code, Art.* 9, *secs.* 8, 9. The assignment must be under hand and seal, and there must be an affidavit of the obligee at the time of the assignment of the amount due on the bond. *Act of* 1763, *ch.* 23, *sec.* 9; *Mayer's Digested Cases,* 226; *Parrot vs. Gibson,* 1 *H. & J.,* 398; *Boyer vs. Turner,* 3 *H. & J.,* 285; *Dorsey vs. Barnes,* 2 *H. & McH.,* 477.

If Osbourn or Eversfield was ever bound as assignor, they were discharged by the *laches* of the holders of the claims.

The money is now claimed to have been paid by Beall's executor to the bank, and the order of the Court directs that he shall stand in its place, as holder of the lien as to one of the judgments. If Beall paid the judgments as executor, out of assets of the estate, he took no assignment of the vendor's lien from the bank, even if competent to transfer it, and by taking an entry of the judgment to his use from the plaintiff's attorney, he obtained only the lien of that judgment, and not a vendor's lien.

*Alexander B. Hagner*, for the National Farmers' Bank of Annapolis, submitted the case on the argument of *William H. Tuck.*

*Samuel H. Berry* and *Henry M. Murray*, for Washington J. Beall.

From the evidence in this case, the vendor's lien on the land sold by Osbourn to Bowie was assigned with the bonds to the first assignee, and by him to Neale, Harris & Co., and by them to the National Bank of Baltimore, and the holders of the bonds and judgments were entitled to this fund arising from the sale of the land, then for the first time brought into Court for distribution.

1st. Because Osbourn held the legal title to the land, never having executed to Bowie a deed thereof. *Iglehart vs. Armiger*, 1 *Bland*, 519; *Ridgely vs. Iglehart*, 3 *Bland*, 540; *Magruder vs. Peter*, 11 *G. & J.*, 217.

2d. Because the land was sold under a decree of the Court, to satisfy the claims of creditors of Bowie, and was brought into Court for distribution among them, according to their prior liens.

3d. The vendor's lien on real estate may be assigned with the bonds or notes taken for the same by express agreement, which is fully established by the proofs in this cause. *Watson vs. Bane, et al.*, 7 *Md.*, 117; *Dixon vs. Dixon*, 1 *Md. Ch. Dec.*, 220; *Hayden vs. Stewart*, 4 *Md. Ch. Dec.*, 280.

4th. The vendor's lien to secure the payment of purchase money is an incident of every contract for the sale of real estate, unless waived or relinquished. *Morton vs. Harrison*, 1 *Bland*, 491; *Iglehart vs. Armiger*, 1 *Bland*, 519; *Ringgold vs. Bryan*, 3 *Md. Ch. Dec.*, 488; *Carr et al. vs. Bell's Admr's*, 11 *Md.*, 285.

5th. Because the said Osbourn, by endorsing said bonds, made himself liable as endorser for the ultimate payment thereof. *Hayden vs. Stewart*, 4 *Md. Ch. Dec.*, 280; *Willis vs. Bryant, Trustee*, 22 *Md.*, 373.

6th. Because the said judgments having been paid by the said Washington J. Beall, as the executor of one of the securities of Thomas F. Bowie, the purchaser of said land, for which said bonds were given, he became entitled by right of substitution to all the securities and liens held by the original vendor, as security for the payment thereof. *Winder vs. Diffenderfer*, 2 *Bland*, 166; *Neely vs. Cooper*, 2 *Bland*, 199, *and note; Ghiselin vs. Ferguson*, 4 *H. & J.*, 522.

*C. C. Magruder*, for Edward H. Calvert.

The Court below properly allowed the claim of Calvert, use of Boyle, as a vendor's lien. Calvert had not parted with the legal title to the land. Indeed, the agreement between him and Bowie expressly provided that the title should not pass until the purchase money was all paid.

When Calvert made the assignment and agreement with Boyle, he only transferred the judgment and vendor's lien as collateral security for the payment of the debt due Boyle, which was afterwards paid.

The payment of the debt by Calvert, relieved in equity the securities passed to Boyle, and restored Calvert's right to the same. *Marriott vs. Handy,* 8 *Gill*, 31.

The facts show a clear case of the retention of the vendor's lien by Calvert, for the payment of the purchase money, and therefore the case comes entirely within the decisions, that when the lien has not been parted with absolutely, or extinguished, it remains in force, and will be held as a security for the protection of the vendor against the purchaser and his vendees, etc. *Dixon vs. Dixon*, 1 *Md. Ch. Dec.*, 222; *Ringgold vs. Bryan*, 3 *Md. Ch. Dec.*, 488–495; 2 *Story's Equity*, secs. 12–17, 18, 19; *Repp vs. Repp*, 12 *G. & J.*, 341; *Magruder vs. Peters*, 11 *G. & J.*, 244; *Ghiselin vs. Ferguson*, 4 *H. & J.*, 520; 1 *John. Chan.*, 308.

The vendor's lien is assignable even by *parol*. *Dryden vs. Frost,* 1 *Leading Cases*, 357; 3 *My. & Cr.*, 67.

MAULSBY, J., delivered the opinion of the Court.

The appeals in this case, in one record, present three questions, which will be treated in the following order:

First: As to the right of Washington J. Beall, Executor of Wm. Z. Beall, to an allowance, out of the fund to be distributed, of the amount paid by him for purchase money, for which his testator was responsible as security for Thomas F. Bowie, the purchaser.

In 1855 Thomas F. Bowie bought of J. A. Osbourn a tract of land in Prince George's County, called Brookefield, and gave him his two single bills, with Wm. Z. Beall and Fielder Bowie as securities, each in the sum of four thousand seven hundred and seventy-seven dollars and thirty-six cents, for the purchase money; the vendor retaining the legal title to the land. At the April terms of 1860 and 1862, respectively, Osbourn obtained judgments on these single bills against Thomas F. Bowie and Fielder Bowie, surviving obligors of Wm. Z. Beall, who was then dead, and also judgments against Washington J. Beall, Executor of the said Wm. Z. Beall. Writs of *fieri facias* were issued on these judgments and levied on the property of Thomas F. Bowie. In 1865 sundry creditors of Thomas F. Bowie filed a bill alleging that he was possessed of a large amount of property, was greatly in debt, that the said judgments were for said purchase money, that *fi. fas.* were issued on said judgments against Thomas F. Bowie and Fielder Bowie, surviving obligors, and levied on sundry property of Thomas F. Bowie, and amongst the rest on Brookefield; that the same was about to be sold to satisfy said judgments, that, in consequence of the involved condition of the estate of the said T. F. Bowie, a sale of his property by the sheriff would be disastrous to the interests of his creditors, and that it would be better for all parties interested therein that the same be sold under a decree of a Court of Equity, and the proceeds distributed amongst the creditors according to their respective rights, liens, priorities and equities; and praying for an injunction to restrain a sale to satisfy said executions, which was

granted. The allegation of the bill on which the injunction was asked was that "the interests of the creditors, and especially of the junior judgment creditors, will be sacrificed, owing to the various characters of the said judgment liens, and encumbrances on the same, and the cloud thereby thrown around the title to said property," if the same be sold under the *fieri facias.*

A decree for a sale was finally had, the property sold by trustees, and the purchase money brought into Court. That for which Brookefield sold was distributed by the auditor in account F, to the payment of these judgments; being part of the proceeds of sale of the property sold by Osbourn to Bowie, to the payment of the purchase money due. The judgments obtained by Osbourn had been entered to various uses, and after the proceedings had depended for several years, the judgment creditor, or his *cestui que trusts,* tired of waiting; and, as the record discloses, about, or after the time the auditor filed his report, they issued *fieri facias,* for the same money, on the judgments against the Executor of Wm. Z. Beall, and compelled him to pay the judgments; those against Bowie and Bowie remaining enjoined at the instance and for the benefit of the other creditors of T. F. Bowie.

The auditor's report was filed 16th January, 1869, and on April 21st, 1869, the Executor filed his petition, alleging that he had been compelled to pay the money. These amounts were by the account F assigned to Jesse A. Osbourn's use, &c., &c., and by the final order, filed 12th July, 1869, were directed to be paid to Washington J. Beall, Executor of Wm. Z. Beall, the surety on the single bills, he, the Court says, "appearing to have paid the said judgments, and to have received an assignment thereof from the National Bank of Baltimore."

There is in the record no proof that Beall, the Executor, paid the judgments. . The only proof is an order of the plaintiff's attorney to enter the judgments of Osbourn, use, &c., against W. Z. Beall's Executors, and against Thomas F.

Bowie and Fielder Bowie, survivors of Beall, to the use of Washington J. Beall. Washington J. Beall in his petition states that he has paid " the entire amount due on the judgments for the purchase money of said land, as executor of W. Z. Beall, who was one of the sureties of the vendee, as is stated in the proceedings in the cause." It is on this allegation, in the view we take of this case, that the right of the executor to be indemnified out of the proceeds of sale of the land, " Brookefield," depends, and not on his right as assignee of the judgments.

His right to be indemnified, as executor, is an equity growing out of all the circumstances disclosed by the record. The complainants in the cause, amongst whom are the parties excepting to the allowance to him as executor, and appealing from the order making a partial allowance, set out in their bill that the purchase money is due from Thomas F. Bowie, the purchaser from Osbourn, and that Wm. Z. Beall was security for the payment of said purchase money; that executions have been issued against Bowie and Bowie, survivors, and they seek to restrain these executions, not on the ground that they are not proper in themselves, or that there is any inequity in them, but in order that they, the other creditors, may be benefitted by a sale other than by the sheriff. If the *fi. fas.* had been executed, the bill discloses that they would have been fully paid from the property of the principal debtor, and the estate of the security, Beall, would have been relieved from all loss; and having induced a Court of Chancery to prevent this on the ground stated, they now seek to throw the executor on the pursuit of his right to the money as assignee of the judgment creditor, or as assignee of the lien of the vendor for the purchase money, and to apply to him all the rules which would apply if he were assignee, by purchase, of the single bills, and were here claiming as assignee of the lien of the vendor.

We think that this would be inequitable in this case. The rules established by Courts of Equity to regulate the pursuit

of vendors' liens, as such, contemplate and apply to cases of conflicting equities, and are designed to give effect to that equity which is the strongest. In this case all equities combine in favor of the right of the executor of Beall, the surety. As stated, the bill concedes that the purchase money is unpaid, and that it is about to be made out of the property of the purchaser, and sets up no equity against its being done, but simply appeals to the clemency of the Court to sell the property in a different mode, for the benefit of the complainants; and goes on the ground that when the property shall be sold in the mode prayed, the liens and encumbrances on it shall be discharged out of the proceeds, as if the bill had not been interposed. The complainants allege in their bill that they are creditors of Bowie by judgments which are liens only on his equitable estate, which by the Act of 1810, ch. 160, is liable to these liens only after the purchase money due shall have been first paid. If they could defeat the right of the security to indemnity, the effect would be that they would appropriate to themselves, not only the vendee's equitable interest in the property, on which only they have any legal or equitable claim, but the entire estate, of which their debtor never was seized, thus forcing their debtor's security to contribute, to the amount of the unpaid purchase money, a fund for their use, to which they had, neither in law nor in equity, any pretence of right. The only right they acquired by their judgments was to the property, after the payment of the purchase money due. If they could force the surety to pay the purchase money due, to that extent they would derive a benefit in excess of that to which their judgments gave them any claim, and under the form of enforcing liens against their debtor's equitable estate, they would obtain, really, not only their debtor's interest, but in addition, the money which the security had been compelled by a Court of Law to pay. Before the complainants can have the equity claimed by their bill, the distribution of the fund brought into Court by the sale of the property, they must do equity, and the first step is

to ask only so much as their debtor really owned, and that all purchase money due by him be paid to whomever it may be due. There can be no doubt that if no bill had been filed, and all parties had been left to their legal rights, and Beall, the security, had paid the purchase money to Osbourn, he could have compelled Osbourn to assign to him not only his judgment against the principal debtor, but also his lien for the purchase money. All the parties, and the fund, being in this Court, and all the equities of all the parties being disclosed, it is hard to see how a Court of Equity could refuse to indemnify the security, and appropriate the money, which really belongs to the purchase money, to the benefit of other parties.

On the proof appearing in the record, which consists of the order of the plaintiff's attorney to enter these judgments which had been obtained for the purchase money of " Brookefield" to the use of Washington J. Beall, it would seem that he is claiming as assignee, by purchase, of the judgments, and his position might be very different from that shewn by his petition. That avers that he, as executor, paid the amount due for the purchase money, for which his testator was bound as security, and it is just to give him an opportunity to furnish proof of that fact. The cause will be remanded, and on such proof being furnished, we think that he will be entitled to an allowance, out of the fund for which " Brookefield " sold, of the whole amount of purchase money which was paid by him as executor of the security in the single bills given for the purchase money.

It is immaterial whether he paid the money under the judgments obtained against him as executor, *de bonis testatoris* or *de bonis propriis.* The only question is as to the fact whether he paid the money as executor, and because judgments against him, as executor of W. Z. Beall, the security, compelled him to do so. If he did not, in fact, pay the money as purchaser, in his own right, of the judgments against himself as executor, the entry of the judgments to

his use places him in a false position, and ought to be struck out. It is in contradiction to the allegation of his petition, and to give him an opportunity to prove that allegation, is what is intended.

The case of *Ghiselin & Worthington vs. Ferguson,* 4 *Har. & John.,* 522, is not identical with this case, but the analogies are strong in many respects, and we think that the decision of that case may be relied on to sustain, generally, the views expressed in this opinion.

Secondly: As to the claim of Edward H. Calvert.

The facts shown by the record are, that Calvert sold a tract of land, "Cheltenham," to Thomas F. Bowie, taking the single bills in question for part of the purchase money, and retained the legal title until the purchase money should be paid. In November, 1865, Calvert obtained judgment on these single bills, and in March, 1866, entered the judgment to the use of Henry Boyle, as security for a debt due by Calvert to Boyle. Afterwards, Calvert paid the debt to Boyle, and the latter ceased to have any interest in the judgment. He had no interest at any time other than as *cestui que use.* The entry of the use to Boyle was not struck out, as it ought to have been, when Calvert paid him his debt; but Boyle is not here asking the protection of the Court. The claim stands, purely and simply on Calvert's lien for unpaid purchase money, and we can perceive no ground on which it can be denied. It will be found that the bill, answers, and all the proceedings in the cause, in express terms, reserve all liens for unpaid purchase money, and seek to apply to the uses of the general creditors of Bowie only the surplus proceeds of sale of the property, after the payment of all purchase money due. This claim was properly allowed.

Thirdly: As to State and county taxes allowed.

The Court is bound by the distinct language of *Article 81, section 71 of the Code of Pub. Gen'l Laws,* and cannot, by construction, avoid its provisions. "Whenever a sale of either real or personal property shall be made by any

ministerial officer, under judicial process or otherwise, all sums due and in arrear for taxes from the party whose property is sold shall be first paid and satisfied."

The *Act of* 1843, *ch.* 208, *sec.* 7, which is codified in *section* 71 above mentioned, was passed upon by this Court in *Fulton, et al. vs. Nicholson, et al.,* 7 *Md.,* 104, which was a case strongly appealing to equitable interposition, if it were possible, and the Court held that all taxes, for personal and real, must be paid out of the mortgaged realty, although personal assets were in the hands of the administrator. The Code, in some of these provisions, is certainly indulgent to delinquent collectors, and the results are sometimes, as in this case, onerous upon the equities of innocent creditors, but this Court has no power to correct the evil, if such it be.

The order of the Court below, in respect of the allowance of taxes, must be affirmed.

So far as any rights involved in these appeals are concerned, the order appealed from in these cases will be affirmed, and the cause remanded, in order that the fund, reserved for further order by the Court below, in the matter of the claim of *Beall's Ex'r,* may be distributed to him on production of the proof before mentioned. The costs will be paid out of the fund.

*Order affirmed, and cause remanded.*

(Decided 1st July, 1870.)